1
2
3
4
5
6                    IN THE UNITED STATES DISTRICT COURT
7
8                   FOR THE NORTHERN DISTRICT OF CALIFORNIA
9
10   JASON YATES,                              No. C 04-02445 WHA
11            Petitioner,
12     v.                                      **ORDER DENYING PETITION
                                               FOR WRIT OF HABEAS CORPUS**
13   STEWART RYAN,
14            Respondent.
15   _____/
16
                              **INTRODUCTION**
17
18        Petitioner Jason Yates is currently serving a life sentence without parole for murder,

19   robbery, and vehicle theft.  After exhausting his remedies in state proceedings, he now seeks

20   federal habeas relief pursuant to 28 U.S.C. 2254.  Initially, respondent's motion to dismiss on

21   ground of timeliness was granted.  Petitioner appealed.  At petitioner's request, this Court

22   indicated a willingness to allow a Rule 60(b) motion if the Ninth Circuit were to remand the

23   case for that limited purpose.  The Ninth Circuit did so.  In January 2008, petitioner's

24   unopposed Rule 60(b) motion was granted.  Respondent was ordered to answer accordingly.

25   This order now reviews the petition on its merits.  For the reasons stated below, the petition for

     habeas corpus is **DENIED**.
26
                               **STATEMENT**
27
28        The prosecution presented the following facts.  In the late evening of April 13, 1993,

     Yates and his co-defendant James Keeter were driving in a pickup truck along the Monterey

     Highway.  Yates kept a .20-gauge sawed-off shotgun and .410-gauge shotgun in the truck.

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

1   Both defendants agreed that Victim Frank Azevedo cut them off in his late model Mustang.

2   According to Keeter, Azevedo's actions enraged Yates.

3       To convince Azevedo to pull over, Yates imitated a police officer making a car stop.

4   He activated a spotlight covered in red tape.  Once Azevedo stopped, Yates used a loudspeaker

5   (which investigators never recovered) to order Azevedo slowly out of the car, to step to the

6   back of the car and lean against it.  Azevedo did so with his feet and hands spread and his back

7   to petitioner.  Yates then killed Azevedo with one shot from a .410-gauge shotgun at close

8   range into the side of his neck.

9       Petitioner's recollection of events was different.  He agreed with Keeter that everything

10  started when Azevedo cut him off on the highway.  Yates denied, however, that he "pulled

11  over" Azevedo.  Rather, the victim signaled with his blinker that he was pulling over, and Yates

12  followed accordingly.  Azevedo exited the car, approached Yates, and complained about Yates'

13  high beams.  Yates purportedly apologized and shook hands with Azevedo.  As the victim

14  returned to his car, Keeter rushed up behind the victim and shot him to death.  Regardless of

15  which version of events was true, Azevedo was killed by a single shotgun blast to the left side

16  of his neck or cheek from a weapon held two or three feet away and pointed downward.

17      After the murder, Yates and Keeter dragged and hoisted Azevedo's body into the pickup

18  truck.  (Yates testified that Keeter alone dragged the body into the truck.)  Yates then drove the

19  truck to a turnout on Metcalf Road.  Keeter followed behind in Azevedo's mustang.  At the

20  turnout, Azevedo's body was thrown off a cliff into the ravine below.  Yates and Keeter then

21  drove back to Yates' home.  They cleaned blood off their clothes and hosed out the back of the

22  truck.  That same night, Yates used Azevedo's credit card to purchase groceries.  In addition,

23  both Yates and Keeter drove to the home of Brett Bristow, a friend of Keeter's, to ask him to

24  sell the stolen Mustang.

25      The police discovered the body the next day.  Yates and Keeter were eventually arrested

26  and charged by information with the following counts: Count One, which was for first-degree

27  murder, with special-circumstance allegations that the murder had been committed by lying in

28  wait and in the course of a robbery; Count Two, which was for robbery; and Count Three,

1   which was for the unlawful driving and taking of a vehicle.  The information further alleged that

2   both defendants had personally used a firearm during the crime.

3       During the trial, the prosecutor theorized that Yates and Keeter acted in concert to

4   commit the crimes.  Each defendant testified and accused the other of being the actual killer.

5   They each denied aiding and abetting the murder and only claimed to be an accessory-after-the-

6   fact.  In November 1995, a jury convicted Yates on all counts.  Keeter was acquitted of murder

7   but convicted of being an accessory to a felony, robbery, and the unlawful taking of a vehicle.

8   In June 1996, Yates was sentenced to life without parole for the murder and consecutive

9   sentences for the robbery and gun use.  The California Court of Appeal affirmed the judgment

10  in June 1998, and the California Supreme Court denied review.  Yates then unsuccessfully

11  sought state habeas relief in the Santa Clara Superior Court, state appellate court, and the state

12  supreme court.  The California Supreme Court denied the petition on procedural grounds.  On

13  June 21, 2004, Yates sought federal habeas relief pursuant to 28 U.S.C. 2254.

14                                  **ANALYSIS**

15      Under the Antiterrorism and Effective Death Penalty Act of 1996, habeas relief can be

16  granted only if the state court decision is "contrary to, or involved an unreasonable application

17  of, clearly established Federal law, as determined by the Supreme Court of the United States,"

18  or is "based on an unreasonable determination of the facts in light of the evidence presented in

19  the State Court proceeding."  28 U.S.C. 2254(d).  Yates filed his habeas petition after AEDPA's

20  effective date, so AEDPA applies.

21      Here, the California Supreme Court summarily denied state habeas petition by citing

22  *In re Robbins*, 18 Cal. 4th 770, 780 (1998) (procedural bar to untimely claims).  "Under the

23  adequate and independent state grounds doctrine, a federal court will not review a question of

24  federal law decided by a state court 'if the decision of that court rests on a state law ground that

25  is independent of the federal question and adequate to support the judgment.'  [A state's]

26  procedural default doctrine is a specific application of this adequate and independent state

27  grounds doctrine.  It bars federal habeas review 'when a state court declined to address a

28

1  prisoner's federal claims because the prisoner had failed to meet a state procedural

2  requirement.'" *Robinson v. Ignacio*, 360 F.3d 1044, 1051 (9th Cir. 2004).

3        The state, however, did not raise the procedural-default argument in its answer.

4  Absent extraordinary circumstances, a procedural default argument is waived by failing to raise

5  it. *Brown v. Maass*, 11 F.3d 914, 914-15 (9th Cir. 1993).  AEDPA did not change this.

6  *See Franklin v. Johnson*, 290 F.3d 1223, 1231, 1232–33 (9th Cir. 2002) (in post-AEDPA case,

7  state waived procedural bar by failing to raise the issue in response to a habeas petition).

8  Procedural default is an affirmative defense and should be raised in the first responsive pleading

9  to avoid waiving it.  *Morrison v. Mahoney*, 399 F.3d 1042, 1046-47 (9th Cir. 2005).

10  Because respondent did not raise the issue of a procedural bar in its answer and instead

11  addressed the merits of petitioner's claims, this order will review the merits of Yates' habeas

12  petition.

13        Under AEDPA, a state court decision must be reviewed with deference.  The statute

14  provides a "'highly deferential standard for evaluating state-court rulings,' which demands that

15  state-court decisions be given the benefit of the doubt."  *Woodford v. Viscotti*, 537 U.S. 19, 24

16  (2002) (per curiam).  There are, however, some limitations to the AEDPA deference.  In *Pirtle*

17  *v. Morgan*, 313 F.3d 1160, 1167–68 (9th Cir. 2002), the Ninth Circuit stated (emphasis added):

18              [F]ollowing our sister circuits — the Third and the Fifth —
            we hold that *when it is clear that a state court has not reached the*
19            *merits of a properly raised issue, we must review it de novo*.
            *See Appel v. Horn*, 250 F.3d 203, 210 (3d Cir.2001) (holding that a
20            federal habeas court must review de novo purely legal issues and
            mixed questions of law and fact when, "although properly
21            preserved by the defendant, the state court has not reached the
            merits of a claim thereafter presented to a federal habeas court");
22            *Mercadel v. Cain*, 179 F.3d 271, 274-75 (5th Cir.1999) (per
            curiam) (*holding that "the AEDPA deference scheme outlined in*
23            *28 U.S.C. § 2254(d)" did not apply to the federal habeas petition*
            *because the state denied the petitioner's motion for post-conviction*
24            *relief on procedural grounds and not on the merits*).  Nonetheless,
            under AEDPA, factual determinations by the state court are
25            presumed correct and can be rebutted only by clear and convincing
            evidence.
26
27  Where the state court did not reach the merits of a particular claim, this order will review the

28  claim *de novo*.  Petitioner's claims are as follows.

United States District Court

For the Northern District of California

**United States District Court**
For the Northern District of California

1    **1.    INEFFECTIVE ASSISTANCE OF COUNSEL.**

2         Petitioner asserts that he had ineffective assistance of counsel. *Strickland v.*

3    *Washington*, 466 U.S. 668 (1984), is considered by the Ninth Circuit to be clearly established

4    federal law for analyzing ineffective assistance of counsel claims. *Wilson v. Henry*, 185 F.3d

5    986, 988 (9th Cir. 1999). *Strickland* sets forth a two-step standard that must be satisfied in

6    order to prove ineffective assistance of counsel. *Strickland*, 466 U.S. at 687-88.

7         *First*, petitioner must show that counsel's representation fell below an objective standard

8    of reasonableness. *Id*. at 668. The question is not what counsel could have done but whether

9    the choices made by counsel were reasonable. *Babbitt v. Calderon*, 151 F.3d 1170, 1173

10   (9th Cir. 1998). Judicial scrutiny of counsel's performance must be highly deferential, and a

11   court must strongly presume that counsel's actions falls within the wide range of reasonable

12   assistance. *Strickland*, 466 U.S. at 688.

13        *Second*, petitioner must show that counsel's performance prejudiced petitioner and

14   deprived petitioner of a fair trial and reliable results. A petitioner must prove that, but for

15   counsel's errors, there is a reasonable probability that the result of the proceeding would have

16   been different. *Id*. at 694. If the state's case were weak, there is a greater likelihood of a

17   reasonable probability that the trial would have been different. *Johnson v. Baldwin*, 114 F.3d

18   835, 839–40 (9th Cir. 1997).

19        **A.    Forensic Expert.**

20        Petitioner argues that his trial counsel should have called a forensic expert to establish

21   that the physical evidence — namely the gunshot pattern on the head of the victim —

22   corroborated his testimony (and not Keeter's). Keeter had testified that the victim was shot as

23   he leaned against the back of the car, with his hands extended forward and his head tilted

24   slightly downward. The coroner testified that the wound in Azevedo's neck was 10 degrees

25   with the horizontal plane and 15 degrees with the longitudinal plane.

26        Yates obtained the sworn declaration of defense forensic expert Robert Venkus who

27   stated that, if the victim were positioned as described by Keeter, the wound path would have

28

been slightly upward and forward, from back to front.[1]  Instead, according to the coroner's report, the wound path was left to right and slightly downward, which was more consistent with Yates' testimony that the victim was shot by Keeter while walking back to his vehicle with his shoulders and head slightly bent forward.  Had his trial counsel called a forensic expert, Yates argues, the physical evidence would have contradicted Keeter's testimony.[2]

This order disagrees.  Whether or not trial counsel acted reasonably need not be reached because petitioner was not prejudiced.  The trial record shows that Keeter's testimony about the relative positions of the victim and shooter was unimportant.  *First*, the wound path did not prove that there was only one possible way Azevedo could have been killed — either in accordance with Yates' version of Keeter's version of events.  The coroner was asked at trial whether "this wound [would] be consistent with someone being on their knees when the shot was fired" (Resp. Exh. B at 413).  The coroner answered that other scenarios were possible, given the downward angle: "It's possible.  But the only thing I can say, this is the angle.  The muzzle of the shotgun should be in a higher position to fire downward at this angle. That scenario may be different, may be the person, the deceased, being on the knee or down, and the shooter was firing from above or he was standing down below and the shooter was standing on higher level and firing from that position" (*ibid*.).

*Second*, Keeter later testified during his cross-examination that he did not actually see the gun being fired "because I, you know, I was just looking down in my lap, just shaking my head, you know, like I can't believe this" (*id*. at 923).  He was not entirely clear about the

---

[1]  The Venkus declaration was attached to Yates' federal habeas petition.  It is unclear from the record when exactly Yates introduced the Venkus declaration during the habeas process.  The California Court of Appeal affirmed the decision of the trial court in June 1998, and the California Supreme Court denied review in September 1998.  The declaration was dated July 9, 2001.  In March 2002, Yates filed a third petition for writ of habeas corpus with the California Superior Court (which was eventually denied).  Yates admits that he inadvertently did not attach the declaration to his state supreme court habeas petition.  All that is clear from the record is that Venkus was not called to testify on Yates' behalf during the trial.

[2]  According to respondent, Yates has not provided a copy of the coroner's report, nor does it appear in the list of exhibits introduced into evidence.  (The list of exhibits can be found at Resp. Exh. A at 510–29.) Respondent assumes for the sake of argument that Yates accurately characterized the coroner's report (Ans. 6–7, n.4 and n.5).

United States District Court

For the Northern District of California

1  position of Yates and Azevedo during the actual killing.  What he testified to was his

2  speculation of Azevedo and Yates' relative positions.

3      *Third*, during closing arguments, the prosecutor stated that the wound path was

4  downward but did not conclude who in fact was the actual killer or what Azevedo's actual

5  position was.  Petitioner's counsel, on the other hand, argued that petitioner's account was

6  correct because Keeter was clearly taller than Yates and was therefore more likely to create the

7  downward wound path.  Nonetheless, the jury still found Yates to be the actual culprit.  In sum,

8  Keeter's testimony regarding the position of the victim and killer had little impact on the jury.

9  There was no reasonable probability that a defense forensic expert rebutting Keeter's testimony

10  would have produced a more favorable outcome for Yates here.  There was no ineffective

11  assistance of counsel.

**B.      Impeachment of Keeter.**

13      Yates contends that his trial counsel failed to impeach Keeter about the shooting of

14  Azevedo.  Keeter had testified that Yates ordered Azevedo out of the car, told him to lean in a

15  spreadeagle position over the back of the car, and shot him.  According to petitioner, however,

16  Keeter had told a different story to the police on April 29, 1993, sixteen days after the homicide

17  (Pet. 14–15):

> Keeter told Officer Zarate that Azevedo honked his horn and
> motioned for petitioner to pull over.  Petitioner pulled over behind
> Azevedo's Mustang.  Both stepped out of their vehicles and started
> cussing at each other.  A fight ensued.  Azevedo struck petitioner
> in the face and petitioner fell to the ground.  Keeter told Zarate that
> petitioner got up, ran back to his truck, grabbed a gun from under
> the seat, ran over to Acevedo [sic] and stuck the gun in his face.
> Keeter told Zarate that he thought petitioner was just going to
> scare Azevedo.  Keeter looked down, heard the gun shot, looked
> up and saw Azevedo fall to the ground.

Petitioner says that trial counsel never impeached Keeter with this statement.

25      Again, this order finds petitioner's arguments unavailing.  Respondent is correct to point

26  out that "[p]etitioner purports to quote from an account of what Keeter told the police . . .

27  yet petitioner does not identify that account or suggest where it might be found in the record"

28  (Ans. 13).  There is no indication whatsoever in the record that this account even exists.

Furthermore, no evidentiary hearing is necessary because, even if Yates were correct, there was

**United States District Court**
For the Northern District of California

7

United States District Court

For the Northern District of California

1   no reasonable probability that the result of the proceeding would have been different,

2   as discussed below.

3          Assuming *arguendo* that the statement existed (which this order does not concede),

4   there was plenty of impeachment evidence against Keeter.  Trial counsel cross-examined Keeter

5   and established that Keeter had lied to the police when he said that Yates and Azevedo were

6   fighting (Resp. Exh. B at 1125–26; *see also* 1177):

> Q:  Well, you told Officer Zarate that Jason and the Mustang driver
> were cussing each other out.
>
> A:  Yes.  I believe that's what I told him.
>
> Q:  And when you said that, was that the truth or was that a lie?
>
> A:  That's a lie.
>
> Q:  Chalk up another lie to you then.  And you told Officer Zarate
> that Jason pushed the driver of that Mustang?
>
> A:  Yes, I did.
>
> Q:  Was that the truth or was that lie?
>
> A:  That's a lie.
>
> Q:  Chalk up a [sic] another lie to you.

17  These multiple stories were also addressed during Keeter's direct examination.  Keeter admitted

18  that he told the police that Azevedo hit Yates in the face "to make the reason why Jason killed

19  him looked [sic] like self-defense" (*id.* at 981–984).  During his closing argument, Keeter's trial

20  counsel stated, "He's telling you, hey, you know, when I was interviewed by the cops I gave

21  them the right information about who shot but I couldn't do that to Jason.  I was trying to help

22  him.  I tried to make the story good about a fight and a this and a that so Jason's even got a

23  ways to go" (*id.* at 2845).  Yates' counsel repeatedly emphasized during his closing argument

24  that Keeter lied (*id.* at 2895, 2901, 2902, 2907–08, 2918, 2960, 2962, 2967).  This order finds

25  that there was no prejudice to Yates as Keeter's credibility was impeached during the course of

26  trial.  Significantly, petitioner's traverse memorandum remains silent with respect to the points

27  raised in respondent's answer; Yates does not dispute the lack of a record supporting his

28  account, nor does he dispute that Keeter's credibility was savagely attacked.  Consequently,

1   there was no ineffective assistance of counsel with respect to this claim.

2         **C.      Hearsay Statements.**

3         Yates next contends that trial counsel failed to object to hearsay statements offered by

4   Keeter, Pamela Craig (Keeter's mother), and Cassandra Keeter (Keeter's sister).  Witness Craig

5   testified that Keeter told her that there was a murder, that he saw it and it scared him, and that

6   petitioner threatened him (*id.* at 751).  Similarly, Witness Cassandra Keeter testified that her

7   brother had told her that something had happened that scared him badly and that he was going

8   to get blamed for it — "basically, that he had seen something that Jason had did and that he

9   couldn't stop it or control it and basically that he was scared" (*id.* at 765; *see also* 760, 770).

10  Yates' trial counsel did not object to these statements.  Because the trial was a "credibility

11  contest between Keeter and petitioner," Yates argues, the admission of these statements tipped

12  the scales in favor of Keeter.

13        Again, whether or not Yates' trial counsel acted reasonably need not be reached;

14  there was no prejudice to petitioner caused by the admission of statements by Witness Craig

15  and Cassandra Keeter.  Assuming *arguendo* that the statements were hearsay, their testimonies

16  added little to the case and could not have affected the outcome.  On direct, Witness Craig

17  stated that she "wouldn't let James tell [her] that much" (*id.* at 751).  Defense counsel then

18  cross-examined both witnesses.  Witness Craig admitted that she did not know what role Keeter

19  played in the crime and she never asked if he pulled the trigger.  Cassandra Keeter also admitted

20  that she stopped asking her brother about what happened because she was afraid of what the

21  answer might be.  She also did not realize that Keeter had left a ring at her house — a ring that

22  had been stolen from Azevedo after he was killed.  Cassandra Keeter did not seem to be aware

23  of the more aggressive side of her brother, even when presented with evidence of his having

24  threatened somebody over the sale of the victim's vehicle or destroying public property by

25  shooting at street signs with a sawed-off shotgun.  She also believed him to be a truthful person.

26  She was, however, presented with evidence showing how Keeter had lied to police officers

27  about the crime.

28        Keeter's counsel barely mentioned the testimonies of Witness Craig and Cassandra

*United States District Court*
For the Northern District of California

9

Keeter during closing arguments:  "And we learned about James as a real person with warts, with problems, problems with school, problems with family, problems with this, problems with that.  Nobody sugar-coated him . . .  Mom told you about that.  Mom told you all about that. Yeah, well, you know, you go through a couple stories.  If we get to the end, James can't live with himself and he tells you the truth.  Even if it means getting up here and admitting to his participation, the part that he had to do in this overall thing, he gets to the truth.  An interesting comment.  Actually from, I believe, all 3 of them were character witnesses . . .  It's his mom. It's his sister.  This is his brother-in-law sort of, fiancé.  Not one of them said, you know, James is just no trouble at all and never lies, honest as the day is long.  But what they did tell you was they told you of a man who ultimately takes the responsibility for what he did" (*id.* at 2844–45).  Neither Keeter's counsel nor the prosecutor brought up the statements again.

In sum, the jury was exposed to allegedly inadmissible hearsay statements about a co-defendant (who frequently lied) made by his mother and sister who knew little about the actual incident, knew little about Keeter's criminal side, and were biased in their desire to protect him.  Keeter's counsel and the prosecutor did not find the specific testimony important enough to bring up again at the end of the case.  There was no prejudice.  Consequently, there was no ineffective assistance of counsel here.

### D.    Opinion Evidence.

Petitioner argues that his trial counsel was ineffective because he failed to object to opinion evidence that Keeter was a follower and therefore could not be responsible for the homicide.  Witness Craig, Cassandra Keeter, and Dan Donati (Keeter's friend) testified that Keeter was non-violent, passive, and a follower.

This argument goes nowhere.  California Evidence Code § 1102 provides:  "In a criminal action, evidence of the defendant's character or a trait of his character in the form of an opinion or evidence of his reputation is not made inadmissible by Section 1101 if such evidence is:  (a) Offered by the defendant to prove his conduct in conformity with such character or trait of character."  Petitioner has not explained in any of his memoranda why the evidence offered by Witnesses Craig, Keeter, and Donati was inadmissible.

**United States District Court**
For the Northern District of California

1

### E. Petitioner's Juvenile Convictions.

2   Petitioner contends that his trial counsel "stupidly assisted the prosecution" when he

3   asked petitioner on direct examination about his juvenile convictions for possession of stolen

4   property.  On cross examination, petitioner described the conduct underlying those convictions.

5   Yates now argues that trial counsel acted ineffectively because the evidence was inadmissible

6   and trial counsel failed to object to the use of the evidence, nor did he request a limiting

7   instruction.  "Juvenile adjudications are not admissible for impeachment."  *People v. Olivencia*,

8   204 Cal. App. 3d 1391, 1403 (1988).  Because Yates' trial counsel acted ineffectively, the jury

9   was free to consider his prior bad acts.

10   The California Supreme Court summarily denied without comment the petition for

11   review on this claim.  Here, petitioner is wrong on California law.  Since *Olivencia*, the state

12   court has allowed evidence of juvenile adjudications.  "We conclude that under [*People v.*

13   *Wheeler*, 4 Cal. 4th 284 (1992)], at least in cases which do not fall under Welfare and

14   Institutions Code section 1772, the prosecution may introduce prior conduct evincing moral

15   turpitude even if such conduct was the subject of a juvenile adjudication, subject, of course, to

16   the restrictions imposed under Evidence Code section 352 and other applicable evidentiary

17   limitations."  *People v. Lee*, 28 Cal. App. 4th, 1724, 1740 (1994).[3]  Because the evidence was

18   properly admitted, there was no prejudice when trial counsel did not object to the evidence or

19   ask for a limiting instruction.

### F. .20-Gauge Shotgun.

21   Yates then says his counsel acted ineffectively when he failed to object to the

22   prosecution's introduction of a .20-gauge sawed-off shotgun.  The arresting officer testified that

---

26   [3] California Welfare and Institutions Code Section 1772 addresses honorable discharge; release from penalties and disabilities; court petitions setting aside guilty verdict and dismissing accusation or information; remaining penalties and disabilities, including eligibility for appointment as peace officer.  California Evidence Code section 352 provides:  "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

1  Yates said that he had obtained the gun in exchange for dope.  Because the victim had been shot

2  with a .410-gauge shotgun, this evidence was irrelevant and therefore inadmissible, petitioner

3  argues.

4         The California Supreme Court summarily denied review of this claim.  This order finds

5  that this evidence was relevant.  The jury could have inferred, as the prosecutor asked it to,

6  that both defendants were armed when they robbed and killed Victim Azevedo, regardless of

7  who actually shot him.  Petitioner had tried to argue that Keeter bought and used the .410-gauge

8  shotgun.  Because the evidence showed that Yates also purchased and used the .20-gauge

9  shotgun before the homicide, the jury could infer that Yates knew how to fire shotguns and was

10  therefore just as capable and willing as Keeter of killing Victim Azevedo.  Because the

11  evidence was relevant and admissible, there was no prejudice when trial counsel did not object

12  on ground of irrelevance.

13                **G.     Stolen Property Found in Petitioner's Truck after the Homicide.**

14         Yates claims that trial counsel should have objected when the prosecutor introduced

15  evidence that stolen property in Yates' truck was found after his arrest.  An officer had found

16  nineteen pieces of stereo equipment with serial numbers ground off and stereo amplifiers inside

17  a bag.  The officer also testified that he found 82 grams of marijuana.  The jury was therefore

18  led to conclude that petitioner was a bad person because he dealt drugs and had a pattern of

19  stealing property in exchange for drugs.

20         Review of this claim was denied by the California Supreme Court.  This order holds that

21  the evidence was admissible and trial counsel did not prejudice petitioner when he did not

22  object to its introduction.  Under California Evidence Code Section 1101(c), evidence is

23  admissible if it were offered "to support attack the credibility of a witness."  A police officer

24  testified that Yates had said he purchased the stereo equipment at a flea market and was

25  unaware of the marijuana.  The disputed evidence here tended to show that Yates was not

26  credible.

27         This evidence also supported Keeter's version of events.  Keeter testified that he and

28  Yates regularly burglarized cars.  Yates said that Keeter was lying.  This was relevant to the

United States District Court

For the Northern District of California

case because Keeter had testified that he thought that they were only going to burglarize more cars the night of the homicide.  This meant that there was little prejudice to Yates; Keeter provided testimony about their history with burglary, rendering it old news to the jury.  There was no ineffective assistance of counsel regarding this claim.

**H.    Stolen Tires.**

Trial counsel failed to object when the prosecutor introduced evidence that petitioner had stolen tires for his truck, petitioner says.  This evidence prejudiced petitioner and influenced the jury to believe that Yates was a bad person who had a pattern of stealing.

The California Supreme Court denied review of this claim.  For the same reasons stated above with respect to the stolen stereo equipment, this order holds that there was no ineffective assistance of counsel due to his failure to object to evidence of stolen tires.

**I.    Stolen Ski Masks.**

Yates says that his trial counsel acted ineffectively when he failed to object to the testimony of Keeter's friends.  According to their testimony, these friends saw petitioner steal ski masks prior to the homicide.  Petitioner also allegedly told them after the homicide that the mask would come in handy during a robbery.

Review of this claim was denied by the state court.  This order holds that the evidence was admissible and therefore there was no prejudice when trial counsel did not object to its introduction.  *First*, petitioner mischaracterizes the testimony; nobody testified to actually seeing petitioner steal ski masks.  Keeter's friend testified (Resp. Exh. B at 279):

> Q:  Did he [Yates] — did he say anything to you or anyone else about how he procured these ski masks from the store?
>
> A:  Um, I don't think so.
>
> Q:  Did he say he stole them?
>
> A:  I don't think so.  I don't think he paid for them, though.
>
> Q:  Pardon?
>
> A:  I don't think he paid for them though.  I never heard him say he stole them.

1   Shortly thereafter, the witness testified, "Um, I think, after he [Yates] got the ski mask, he said

2   something about, these will come in handy to rob something.  I wasn't really paying attention"

3   (*id.* at 281).  *Second*, the evidence was relevant to show intent.  During his trial, Yates claimed

4   that he was depressed, suicidal, and participated in robbery after the homicide only because

5   Keeter forced him to do so.  The evidence rebutted this claim by showing Yates played a more

6   active role and had the requisite intent for the crime.  The evidence was admissible and there

7   was no prejudice when trial counsel failed to object.

8              **J.      Keeter's Testimony Concerning Burglary and Theft.**

9         Keeter testified that petitioner broke into cars to steal stereos and was the one to dispose

10   of the stolen property.  During Keeter's long experience with burglaries, theft, and possession

11   of stolen property, Yates was the leader and Keeter was the follower.  Trial counsel never

12   objected to this testimony.  Petitioner did not explain why this was inadmissible.

13         The California Supreme Court denied review of this claim.  This order holds that the

14   evidence was relevant and therefore admissible.  The evidence showed the relationship between

15   Yates and Keeter and their previous criminal efforts, all of which was relevant as to how they

16   acted with respect to the homicide and robbery.  No prejudice resulted from the lack of an

17   objection to properly admissible evidence.

18              **K.      Closing Arguments.**

19         Petitioner contends that trial counsel was ineffective during closing arguments because

20   (i) he failed to properly address Witness Marcus Amshoff's testimony; (ii) he failed to argue

21   that the physical evidence supported petitioner's version of events rather than Keeter's;

22   and (iii) he failed to object to prosecutorial misconduct.  The third claim will be discussed in a

23   later section of this order.

24         Respondent says that review of this claim must be highly deferential.  "[C]ounsel has

25   wide latitude in deciding how best to represent a client, and deference to counsel's tactical

26   decisions in his closing presentation is particularly important because of the broad range of

27   legitimate defense strategy at that stage.  Closing arguments should 'sharpen and clarify the

28   issues for resolution by the trier of fact,' but which issues to sharpen and how best to clarify

United States District Court

For the Northern District of California

them are questions with many reasonable answers.  Indeed, it might sometimes make sense to forego closing argument altogether.  Judicial review of a defense attorney's summation is therefore *highly deferential — and doubly deferential when it is conducted through the lens of federal habeas*."  *Yarborough v. Gentry*, 540 U.S. 1, at 5–6 (2003) (per curiam) (emphasis added).

Petitioner says that doubly-deferential review does not apply to trial counsel's summation here because respondents failed to take into account the different posture.  The claim pertaining to counsel's ineffectiveness during closing arguments was not decided by the state supreme court on the merits.  Without reaching this issue, this order will assume *arguendo* that the doubly-deferential review does not apply.

Yates argues that Witness Amshoff's testimony corroborated his version of the facts, which his trial counsel failed to use during closing arguments.  Witness Amshoff testified that the crime occurred behind the sound wall where his house was located.  He said that he could see and hear what was happening on the other side of the wall.  He said that he did not see any red lights when he heard the two vehicles stop behind the wall.  According to petitioner, this evidence corroborated his own testimony that he stopped his vehicle because of the victim's hand gestures (and not because he simulated a police stop, per Keeter's testimony).  In addition, Witness Amshoff said that he heard the cars come to an abrupt stop, not a gradual one, as Keeter testified.

This order finds that there was no prejudice because the aspects of the witness's testimony that petitioner wanted greater emphasis on were not that helpful to his case.  Witness Amshoff suggested that, although the sound wall blocked him from seeing the actual incident, he should have been able to see flashing lights in the trees (Resp. Exh. B at 434–35):

> Q:  And as you turned to look, what, if anything, of lights did you see?
>
> A:  I don't recall seeing any lights, because they are below the level of eyesight, below the level of the wall at that point.  The lights would be, well, they would actually probably be below the level I was standing on behind the wall, behind the raised railroad tracks.  So —

1

2

Q:  In that dark area, if it had been like you thought, a police car flashing a red light, might you have been able to see the red light reflecting the surrounding environment?

3

4

A:  That would have been something that, you know, in retrospect, yeah, I should have been able to see some lights on the trees. Right there, there's trees there, plus I had five trees on my back wall.

5

6

Q:  And you saw nothing of any lights of any nature.

7

A:  No, I did not.

8

This was speculative, however; the witness was merely guessing at what he thought flashing

9

police lights would look like.  He never said that he knew that he would have seen the reflection

10

of flashing lights.  Moreover, it was possible that Yates had stopped flashing the lights by the

11

time Witness Amshoff began to pay closer attention to what was happening.  Finally, how the

12

cars came to a stop was not something that created the reasonable probability that the result of

13

the proceeding would have been different.

14

Yates further contends that his trial counsel did not argue that physical evidence

15

supported his version of the homicide.  Medical examiner Massoud Vameghi testified that there

16

was a downward shot pattern.  Had Keeter been telling the truth, the angle of the shot would

17

have been upward and not downward.  (This claim has been addressed in an earlier section of

18

this order.)  This order finds that there was no prejudice.  Trial counsel *did* argue that physical

19

evidence supported Yates' version of the facts:  he said that Keeter was taller than petitioner

20

and Azevedo and was therefore the actual person who made the downward shot.  There was no

21

ineffective assistance of counsel.

22

Petitioner maintains finally maintains that his appellate counsel was ineffective for

23

failing to raise on appeal the argument that his trial was fundamentally unfair and in violation of

24

the Due Process clause.  Appellate counsel should have raised the issues discussed in Sections

25

2–4 below.  This order disagrees, noting that a defendant has no constitutional right to compel

26

appellate counsel "to press nonfrivolous points requested by the client, if counsel, as a matter of

27

professional judgment, decides not to present those points."  *Jones v. Barnes*, 463 U.S. 745

28

(1983).  Even assuming that appellate counsel should have raised these points, there was no

resulting prejudice, as discussed below.

United States District Court

For the Northern District of California

2.      "ACQUITTAL FIRST" INSTRUCTION.

The jury was instructed as follows (Resp. Exh. B at 3041, 3050–51):

> The court cannot accept a verdict of guilty of second-degree murder as to Count I unless the jury also unanimously finds and returns a signed verdict form of not guilty as to murder of the first degree in the same count.

> However, the court cannot accept a guilty verdict on a lesser crime unless you have unanimously found the defendant not guilty of the charge or greater crimes.

Petitioner argues that these instructions violated his due process rights because they required him to prove he was not guilty of the greater offense before the jury could return a verdict on any lesser offense. This shifted the burden of proof and created an improper presumption, says petitioner.

"Our cases make clear that '[s]uch shifting of the burden of persuasion with respect to a fact which the State deems so important that it must be either proved or presumed is impermissible under the Due Process Clause.'" *Francis v. Franklin*, 471 U.S. 307, 317 (1985). The Supreme Court has also not "foreclose[d] the possibility that in an unusual case, a deliberate and especially egregious error of the trial type, or one that is combined with a pattern of prosecutorial misconduct, might so infect the integrity of the proceeding as to warrant the grant of habeas relief, even if it did not substantially influence the jury's verdict." *Brecht v. Abrahamson*, 507, U.S. 619, 638 n.9 (1993). Petitioner contends that the instruction was such an egregious error that he is entitled to habeas relief.

This order disagrees. "The Supreme Court has established that 'in reviewing an ambiguous instruction . . . we inquire whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution.' Indeed, 'the proper inquiry is not whether the instruction 'could have' been applied in an unconstitutional manner, but whether there is a reasonable likelihood that the jury *did* so apply.'" *Byrd v. Lewis*, 510 F.3d 1045, 1052 (9th Cir. 2007). Here, Yates provides no analysis (or supporting authority) explaining how the sequence of returning verdicts created a reasonable likelihood that the jury applied the instruction in a way that violated his due process rights. Nor does he address any of this in his traverse memorandum. The jury was merely instructed to not return a guilty verdict

United States District Court

For the Northern District of California

1   on a lesser crime unless it had first found the defendant not guilty of the greater crime.  How

2   this constituted an egregious error is a mystery.

3      Yates further argues that the instruction "invited a compromise verdict" (Pet. 26).

4   He explains:  "If a juror thought that petitioner was not guilty of murder but guilty of some

5   lesser included homicide, that juror was required to convince the other jurors that petitioner

6   was not guilty of murder in the first or second degree, beyond a reasonable doubt, before the

7   jury could reach a verdict of guilty on a lesser degree of homicide.  Finding himself in the

8   minority, the instruction placed the juror in the position of either giving up, or compromising.

9   Therefore, the instruction amounted to an invitation to compromise" (*ibid*.).  He cites

10  *United States v. Jackson*, 726 F.2d 1466, 1469 (9th Cir. 1984):

11      The danger to the defendant of the charge requiring acquittal of
    the greater offense before the lesser offense is considered is clear:

12      "If the jury is heavily for conviction on the greater offense,
    dissenters favoring the lesser may throw in the sponge rather than

13      cause a mistrial that would leave the defendant with no conviction
    at all, although the jury might have reached sincere and unanimous

14      agreement with respect to the lesser charge."

15     *Jackson* is inapposite.  There, the trial court did not even allow the jury to consider the

16  lesser offense unless the jury first unanimously acquitted the defendant of the greater offense.

17  "Under this instruction, the jury could not consider the lesser offense at all if unable to agree on

18  a verdict for the greater offense."  *Jackson*, 726 F.2d at 1470.  In Yates' situation, the jury was

19  not told how or in what order to consider the lesser offense.  The jury was allowed to consider

20  the lesser offense — it merely had to *find and return* a not guilty verdict on the greater crime

21  before it could *find and return* a guilty verdict on the lesser crime.  There is nothing to support

22  petitioner's contention of impropriety by the trial court or prejudice by trial counsel with respect

23  to these instructions.

24     **3.**   **TRIAL COURT'S JURY INSTRUCTION REJECTING**
       **THE TESTIMONY OF A WITNESS.**

25  The jury was instructed as follows (Resp. Exh. B at 3021):

26      A witness who is willfully false in one material part of his or her
    testimony is to be distrusted in others.  You may reject the whole

27      testimony of a witness who willfully has testified falsely as to a
    material point, unless from all the evidence you believe the

28      probability of truth favors his or her testimony in other particulars.

United States District Court

For the Northern District of California

1    Petitioner argues that the instruction violated due process of law because it allowed the jury to

2    convict him upon proof "by probability of the truth of the evidence" rather than by proof

3    beyond a reasonable doubt.  Even if the jury were skeptical of a witness' testimony, a defendant

4    could still be convicted if the jury found that the "probability of truth" supported the witness'

5    testimony.  "Lest there remain any doubt about the constitutional stature of the reasonable-

6    doubt standard, we explicitly hold that the Due Process Clause protects the accused against

7    conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute

8    the crime with which he is charged."  *In re Winship*, 397 U.S. 358, 363 (1970).  In the instant

9    action, the jury believed the testimony of Keeter over that of Yates.  Yet, Keeter made various

10   inconsistent and untruthful statements, according to petitioner.  The jury nonetheless convicted

11   petitioner upon a "probability of truth."

12          This argument is completely unpersuasive.  In *Turner v. Calderon*, 281 F.3d 851

13   (9th Cir. 2002), the Ninth Circuit examined the same instruction, which was taken from

14   California Criminal Jury instruction 2.21.2, the willfully-false witness instruction.  The Ninth

15   Circuit held that "[n]o reasonable jurist could conclude that, viewed in context, this 'instruction

16   by itself so infected the entire trial that the resulting conviction violates due process.'"

17   *Id.* at 865–66.  There was no prejudice here.

18          Furthermore, defense counsel acted reasonably when he did not object to the instruction.

19   As the defense continued to assert that Keeter was lying throughout the trial, counsel could use

20   the instruction to argue that Keeter's testimony should be rejected in whole.  Petitioner does not

21   dispute this in his traverse memorandum.

22          **4.     UNANIMITY INSTRUCTION.**

23          Yates was charged with murder on the theories of implied and express malice and felony

24   murder.  Petitioner next argues that the trial court failed to give and trial counsel failed to

25   request a unanimity instruction.  He cites *People v. Mickle*, 54 Cal. 3d 140, 178 (1991),

26   to support the proposition that petitioner was entitled to a unanimity instruction under

27   California law:  "[T]he requirement of jury unanimity in criminal cases is of constitutional

28   origin.  It is primarily intended to ensure that jurors agree upon a particular act where evidence

of more than one possible act constituting a charged criminal offense is introduced." Petitioner, however, misstates state law. His position also contradicts federal law.

According to California law, "[a]s for defendant's separate claim that a unanimity instruction should have been given, we find no reason to depart from our cases that have 'repeatedly rejected this contention, holding that the jurors need not unanimously agree on a theory of first-degree murder as either felony murder or murder with premeditation and deliberation.'" *People v. Morgan*, 42 Cal. 4th 593, 617 (2007). *See also People v. Box*, 23 Cal. 4th 1153, 1212 (2000). Nor does federal law require a unanimity instruction. "In [*Schad v. Arizona*, 501 U.S. 624 (1991)], the Supreme Court held that it was constitutional for the State of Arizona to require only a general verdict for first-degree murder based on either premeditation or felony murder without jury unanimity as to which theory applied." *Sullivan v. Borg*, 1 F.3d 926, 927 (9th Cir. 1993). No unanimity instruction was required here. Nor does petitioner address this in his traverse memorandum.

**5.     PROSECUTORIAL MISCONDUCT.**

Yates says that his trial was fundamentally unfair because the prosecutor was guilty of prejudicial misconduct during his closing argument when he appealed to the anger and passions of the jury. Yates cites *Bains v. Cambra*, 204 F.3d 964, 974–75 (9th Cir. 2000), claiming that the Ninth Circuit condemns argument that is inflammatory or appeals to bias or prejudice.

This order disagrees with petitioner's use of *Bains*. In *Bains*, the Ninth Circuit held that the Ninth Circuit violated the defendant's federal due process and equal protection rights when, in closing arguments, he emphasized permissible testimony concerning the beliefs of the Sikh religion in a manner that went beyond providing evidence of motive and intent underlying the alleged murder and invited the jury to rely on prejudices and racial, ethnic, and religious stereotypes. Here, the parts of the prosecutor's argument that petitioner finds objectionable were much less inflammatory. Petitioner objects to the following excerpts: "George Azevedo was ordered out of the car, and George Azevedo was executed" (Resp. Exh. B at 3000). "The callousness of the manner of death and the lack of remorse is appalling. This brutal crime is a blot on our community" (*id.* at 2997).

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

This language did not constitute prejudicial misconduct.  The prosecutor's remarks would have to have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Hall v. Whitley*, 935 F.2d 164, 165 (9th Cir. 1991).  A prosecutor can make permissible inferences drawn from the evidence. *Duckett v. Godinez*, 67 F.3d 734, 742 (9th Cir. 1995).  This order finds that none of the "objectionable" comments rose to the level of a remark that so infected the trial with unfairness as to make the resulting conviction a denial of due process.

Yates further argues that the prosecutor introduced false evidence:  "[h]e used a manniquin [sic] falsely depicting the shot angle in order to sell his case that petitioner's version of the homicide was a lie and Keeter'a [sic] was the truth" (Pet. 33).  The Supreme Court has acknowledged "[t]he principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, implicit in any concept of ordered liberty." *Napue v. People of State of Illinois*, 360 U.S. 264, 269 (1959).

Again, the claim that the prosecutor introduced false evidence is untrue.  The record does not show that the prosecutor falsely depicted the angle of the shot.  The prosecutor indicated that the demonstration was inexact (Resp. Exh. B at 2996):  "The angle of the wound, the wound in George Azevedo's body.  We have this for you to play with.  My only regret is that the coroner did not find a more substantial piece of rod which would have maintained its straight shape, but I'm sure that you can bend it straight and get a good, close approximation of the angle."  In addition, there was little prejudice given the rest of the evidence regarding the gunshot.  Even if the angle of the rod depicting the gunshot into the mannequin's head were incorrect, it just had to be downward, in accordance with the coroner's testimony.  This could have been caused by numerous scenarios and not just by the disparate height of the two co-defendants.  This did not constitute false evidence.  Nor was it the kind of evidence that tainted court proceedings.

**6.      APPOINTMENT OF NEW COUNSEL FOR PETITIONER'S MOTION FOR A NEW TRIAL.**

After the jury returned a guilty verdict, petitioner moved to appoint new counsel to help him prepare a motion for new trial on the ground of ineffectiveness of counsel.  Petitioner now

United States District Court

For the Northern District of California

1    argues that he was denied due process because the trial court refused to appoint different

2    counsel for the motion for new trial.  "The ultimate constitutional question the federal courts

3    must answer here . . . [is] whether this error actually violated [petitioner's] constitutional rights

4    in that the conflict between [petitioner] and his attorney had become so great that it resulted in a

5    total lack of communication or other significant impediment that resulted in turn in an

6    attorney-client relationship that fell short of that required by the Sixth Amendment."  *Schell v.*

7    *Witek*, 218, F.3d 1017, 1026 (9th Cir. 2000).  The California Supreme Court denied review of

8    this claim.

9         Petitioner says that an evidentiary hearing is appropriate here.  He first argues that the

10   state trial court inadequately inquired into whether the attorney-client relationship had

11   deteriorated.  The state court only focused on whether Yates had a valid claim of ineffective

12   assistance of counsel based on counsel's alleged omissions or misdeeds.  Yates further argues

13   that he has shown an irreconcilable conflict that required substitution of counsel.  His attorney

14   clearly could not argue to his own ineffectiveness.

15        This order disagrees with petitioner for the following reasons.  *First*, this order finds that

16   the trial court went to great lengths to fulfill petitioner's wishes.  Upon petitioner's request,

17   the trial court granted petitioner's request to discharge his retained trial counsel and appoint a

18   public defender in his stead.  After the public defender advised the court that it could not take

19   the case, petitioner's original trial counsel was reappointed.  Petitioner then wrote a letter to the

20   trial court, stating that he and his counsel had an irreconcilable conflict that required him to

21   obtain new counsel.  The court held *Marsden* hearings on March 1, 1996, and March 8, 1996.

22   The trial court denied the motion and petitioner's original counsel remained in place.

23   Shortly thereafter, a new motion for incompetency of counsel was filed, raising additional

24   issues.  The state trial court granted defense counsel's request for more time to assess whether

25   to file the motion.  According to a minute order in the clerk's transcript for April 19, 1996,

26   petitioner "submits motion for new trial (not filed)" (Resp. Exh. A at 564).  Defense counsel

27   finally advised the court that he would be filing a motion that addressed some of the issues

28   raised by Yates.  He then filed a "motion to dismiss or modify conviction of PC 187 and to

United States District Court

For the Northern District of California

1    impose proportional sentence" (*id.* at 567).  This motion was denied.  This order finds that the

2    trial court bent over backwards to try and obtain appropriate counsel and to hear petitioner's

3    motions.

4           *Second*, petitioner was given ample opportunity to address these issues at the *Marsden*

5    hearing.  The state trial court stated in the March 8 hearing, "This matter has been continued at

6    the court's direction for a further hearing, as the court has characterized it, pursuant to *People*

7    *versus Marsden* and *People versus Smith* to allow the defendant *to articulate any further*

8    *reasons that he feels are appropriate to bring to the court's attention*, any act of omission or

9    misconduct of his counsel during the trial" (Trav. Exh. N at 3) (emphasis added).  Yates then

10   raised numerous claims, which he admits in his traverse memorandum (Trav. 14).  Yates stated

11   before the trial court that he had problems with counsel (Trav. Exh. N at 5):  "In the

12   attorney-client agreement that was made and signed by myself and Mr. Herrera [trial counsel],

13   agreement number six states that the attorney agrees to represent client to the best of his ability

14   in a vigorous and professional pursuit of client's interest.  I'm sorry to say that Mr. Herrera has

15   fallen severely short of this agreement" (*id.* at 5).  After the two *Marsden* hearings in March,

16   the state trial court concluded, "Then having that representation [that Yates did not intend or

17   cause other counsel to bring a motion for a new trial based on the incompetency of counsel]

18   and the court's examination of the alleged grounds and its own independent elevation [sic]

19   of this issue, I'm going to find that there are no grounds for a motion so far as I can determine at

20   this point, nor is one properly before the court or could be before the court a motion for new

21   trial relative to incompetency of counsel" (*id.* at 7).

22          *Third*, there is simply no authority supporting the proposition that a defendant is entitled

23   to new counsel for presenting a new trial motion once a trial court has determined, after trial,

24   that trial counsel can continue to competently represent the defendant.  *See Wood v. Georgia*,

25   450 U.S. 261, 273–74 (1981) ("If the court finds that an actual conflict of interest existed at that

26   time, and that there was no valid waiver of the right to independent counsel, it must hold a new

27   revocation hearing that is untainted by a legal representative serving conflicting interests").

28

1     *Fourth*, there is no prejudice.  Petitioner has raised numerous ineffective-assistance-of-

2     counsel claims in the instant federal habeas petition.  This order has reviewed these claims and

3     finds that counsel either did not act unreasonably nor there was no resulting prejudice.

4     Consequently, petitioner's claim that the state trial court erred when it did not substitute counsel

5     fails.

6         **7.    JUDICIAL MISCONDUCT.**

7         Petitioner contends that his trial counsel erroneously argued evidence that was not

8     before the jury.  This evidence came from portions of the preliminary hearing testimony of

9     Witness Richard Tucker that had been excluded by stipulation.  Trial counsel explained that he

10    had not properly marked the excised portions and inadvertently used them in his closing

11    argument.  Petitioner then says that the trial court engaged in judicial misconduct when he made

12    "unnecessary disparaging remarks about defense counsel" where a "simple admonition would

13    have sufficed."   The trial court stated (Pet. 36) (emphasis added by petitioner):

> Previously I have advised you that statements of counsel made
> during their closing arguments are not to be construed as evidence.
> That applies to all statements made by the attorneys in their
> closing arguments.  However, I feel that it is appropriate to advise
> you further that during the argument that you just heard, Mr.
> Herrera [trial counsel] made reference to an alleged prior
> testimony of one Richard Tucker to the effect that James Keeter
> had told him that there was a struggle in the acquisition of the
> Mustang and that Brett Bristow mentioned the same struggle to
> him. *This was a grossly negligent misstatement of fact.*  You heard
> the testimony of Richard Tucker read to you, and it contained no
> such mention of statements by Keeter or by Mr. Bristow to Mr.
> Tucker whatsoever.  *Counsel have all had copies of Mr. Tucker's
> prior testimony and know that there is no such testimony.*  You are
> to find that there is no mention of the alleged statements and to
> disregard their implication.  *Further you are to find that Mr.
> Herrera made such statements with the intention to strengthen his
> arguments, to influence your deliberations.*

         The state appellate court rejected this claim with an opinion on the merits (Resp. Exh.

24    G).  The claim of judicial misconduct deserves full deferential review, as conceded by

24

1   petitioner.  This order finds that petitioner's characterization of the admonition is incorrect,

2   especially when giving deference to the state appellate court.  The state appellate court held

3   (*id.* at 7–8):

> Both parties acknowledge the test for judicial misconduct.
> "A trial court commits misconduct if it persistently makes
> discourteous and disparaging remarks to defense counsel so
> as to discredit the defense or create the impression it is
> allying itself with the prosecution."  A judge's comments
> are evaluated "'on a case-by-case basis, noting whether the
> peculiar content and circumstances of the court's remarks
> deprived the accused of his right to trial by jury.'  'The
> propriety and prejudicial effect of a particular comment are
> judged both by its content and by the circumstances in
> which it was made.'"  In this case the trial court's
> instruction did not constitute misconduct.  The court
> properly exercised its duty to control the proceedings by
> correcting the prejudicial comment of Mr. Herrera.  The
> resulting admonition was entirely justified, particularly in
> light of the court's concern that a co-defendant's defense
> might otherwise be impaired.

13   Giving the state appellate court appropriate deference, this order holds that there was no

14   reasonable likelihood that the jury misapplied the law from this alleged instructional "error."

15   *See Byrd*, 510 F.3d at 1052.

### 8.    CUMULATIVE PREJUDICE.

17       Finally, Yates contends that he was prejudiced because of the cumulative impact from

18   the numerous errors committed by the trial court, defense counsel, and the prosecutor.  "It is

19   true that, although individual errors may not rise to the level of a constitutional violation,

20   a collection of errors might violate a defendant's constitutional rights."  *Davis v. Woodford*,

21   384 F.3d 628, 654 (9th Cir. 2004).  Nonetheless, Yates' argument of cumulative prejudice fails.

22   Yates has not demonstrated prejudice as to the individual claims, and the nature of the claims

23   does not support a conclusion of cumulative prejudice.  This order finds that Yates' trial was

24   not rendered fundamentally unfair.

### CONCLUSION

26       For the foregoing reasons, the petition for writ of habeas corpus is **DENIED**.

27   **IT IS SO ORDERED.**

28   Dated:  July 14, 2008.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE